✓ FILED ___ LODGED
___ RECEIVED ___ COPY

NOV 1 8 2016

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

HILLARY CHARLES POLK
3217 WEST APOLLO ROAD
PHOENIX, ARIZONA 85041
480-721-1248

```
**********************************
      IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF ARIZONA
     ****************************
```

| | |
|---|---|
| HILLARY CHARLES POLK | )1.4TH AMENDMENT VIOLATION |
|      Plaintiff | )2.INSTITUTIONAL RACISM |
| | )3.NEGLIGENT HIRING |
|     Vs. | )4.NEGLIGENT TRAINING |
| | )5.NEGLIGENT SUPERVISION |
| SKYLINE EDUCATION, INC. | )6.NEGLIGENT RETENTION |
|     Defendant | )7.VICARIOUS LIABIILITY |

CV-16-4014-PHX-DLR

_____

```
*********************************
```
# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA
```
*******************************
```

1. Plaintiff is an Arizona Resident,

2. This is the proper Court for this matter and this Court has jurisdictional authority over this matter at Bar,

3. Plaintiff has been violated, disregarded and caused to suffer the gravest atrocity known to parenthood, the intentional abuse of one's child.

4. As per Principal Brown, as told to Plaintiff during a timely inquiry as to the events that had transpired, Mrs. Brown stated "ON WEDNESDAY, NOVEMBER 17, 2016 AT OR AROUND 1:15 PM, PLAINTIFFS SON (PRINCE CHARLES IMMANUEL POLK) TELEPHONED PLAINTIFF AND ADVISED HIM THAT HE HAD BEEN TOLD TO LEAVE HIS CLASS, ENTER THE HALLWAY ALONG WITH FOUR (4) OTHER STUDENTS, AND DIRECTED TO GO TO THE OFFICE", IN DIRECT VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964.

5. As per Principal Brown, as told to Plaintiff during a timely inquiry as to the events that had transpired, Mrs. Brown stated "THE TEACHER (MS. WESTON, THE MATH TEACHER) HAD SUMMONED THE PRINCIPAL "MRS. BROWN" TO HER CLASSROOM AS A RESULT OF SMELLING MARIJUANA IN HER CLASS IN A PARTICULAR AREA, AND MRS. BROWN HAD INSTRUCTED MR. MIMS TO ESCORT THE FIVE (5) CHILDREN TO THE OFFICE" IN DIRECT VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964.

6. As per Principal Brown, as told to Plaintiff during a timely inquiry as to the events that had transpired, IN DIRECT VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964.

7. MRS. BROWN STATED "ONCE ARRIVING AT THE FRONT OFFICE, PRINCIPAL BROWN ASKED, IF THERE WAS ANY STUDENT THAT SIMPLY WANTED TO TALK TO HER VOLUNTARILY, AND BECAUSE OF THE STELLAR RELATIONSHIP AND REPUTATION EARNED AND OBTAINED BY PRINCIPAL BROWN, THREE OF THE FIVE STUDENTS CONFESSED THERE WRONG DOING AND SURRENDER PILLS AND MARIJUANA PARAPHERNALIA, .

8. As per Principal Brown, as told to Plaintiff during a timely inquiry as to the events that had transpired, Mrs. Brown stated THAT PLAINTIFFS SON, PRINCE CHARLES POLK WAS THEN DIRECTED TO GO BACK TO CLASS, AND HE WAS NO LONGER UNDER SUSPICION, AND THAT HE WAS NOT IN TROUBLE.

9. Plaintiff questioned Principal Brown as to the Search of Plaintiffs son, and his Back Pack, Pockets and shoes, for he had been seized and the unlawful search was conducted by a Mr. Mims.

10. Principal Brown stated that she was not aware of this behavior and would look into Plaintiffs allegations,

11. Plaintiff inquired if this Mr. Mims would possibly be available at the time while Plaintiff was at the school, and Principal Brown, summoned Mr. Mims to her office, and within two (2) or three (3) minutes, Plaintiff and Mr. Mims were face to face.

12. At this time, Principal Brown stated that she had to go on duty in the cafeteria but she would leave Mr. Mims and Plaintiff in her office to talk, Mr. Mims and Plaintiff expressed approval and appreciation,

13. Plaintiff identified himself as the father of Prince Charles Polk and asked Mr. Mims to advise him of the events that led up to the ir meeting,

14. As per Mr. Mims, as told to Plaintiff during a timely inquiry as to the events that had transpired, Mr. Mims stated "THAT MRS/MS. WESTON, THE MATH TEACHER HAD COMPLAINED ABOUT SMELLING MARIJUANA IN HER CLASSROOM AND SUMMONED THE PRINCIPAL TO HER CLASSROOM, AFTER A FEW MINUTES, THE PRINCIPAL ASKED FIVE (5) STUDENTS INTO THE HALLWAY AND ASKED HIM TO COME INTO THE HALLWAY WITH THEM, UPON ARRIVING INTO THE HALLWAY, PRINCIPAL BROWN, ORDERED THE STUDENTS TO HER OFFICE AND ASKED MR. MIMS TO ESCORT THEM".

15. As per Mr. Mims, as told to Plaintiff during a timely inquiry as to the events that had transpired, Mr. Mims stated "THAT WHEN THEY ARRIVED AT THE PRINCIPALS OFFICE, HE WAS ASKED TO STAND WATCH OVER TWO STUDENTS FOR THREE STUDENTS HAD GONE INTO SPEAK WITH THE PRINCIPAL",

16. As per Mr. Mims, as told to Plaintiff during a timely inquiry as to the events that had transpired, Mr. Mims stated "THAT HE WAS SURPRISED WHEN PLAINTIFFS SON WAS TOLD TO GO INTO THE HALLWAY FOR HE WAS QUITE FAMILIAR WITH PRINCE CHARLES POLK AND THAT HE NEVER HAD ANY TROUBLE OUT OF HIM, HE SUGGESTED THAT HE DID NOT BELIEVE THAT HE DID ANYTHING WRONG, AND THAT THERE WAS A GOOD CHANCE THAT HE HAD BEEN SELECTED BECAUSE HE MAY HAVE BEEN SEEN WITH SUSPECTED DRUG USERS OR POSSESSORS OF DRUGS",

17. As per Mr. Mims, as told to Plaintiff during a timely inquiry as to the events that had transpired, Mr. Mims stated "AT THIS POINT, MR. GARCIA/VICE PRINCIPAL CAME OUT INTO THE OFFICE LOBBY AND IUNSTRUCTED HIM TO SEARCH THE BOOK BAGS, POCKETS AND SHOES OF PRINCE CHARLES POLK, AND THAT HE DID SO AS A RESULT OF FOLLOWING ORDERS".

18. As per Mr. Mims, as told to Plaintiff during a timely inquiry as to the events that had transpired, Mr. Mims stated "PRINCE HAD NOTHING UNLAWFUL, DRUG RELATED OR ANYTHING IN VIOLATION OF LAW OR SCHOOL RULES ON HIS PERSON AND HE WAS THEN SENT BACK TO CLASS".

19. Plaintiff, advised Mr. Mims that it is clearly understood that to insure school safety and drug free, there must be a balance and check system in place, however to search my son, is unconscionable and highly unlawful.

20. As per Mr. Mims, as told to Plaintiff during a timely inquiry as to the events that had transpired, Mr. Mims stated "searching Prince Charles was not his idea and that he had about 5-6 witnesses that heard Mr. Garcia give the command, meaning Plaintiffs son was publicly humiliated, degraded, and was singled out,

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
## FIRST COMMON CAUSE – 4TH AMENDMENT VIOLATION
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

# The Right to Search Students *Kate R. Ehlenberger*

Student search can be a tool for maintaining safe schools, but school administrators must balance students' individual rights with the school community's need for a safe learning environment.

Littleton, Jonesboro, Springfield, West Paducah, and Pearl. The school tragedies in these communities brought the threat to school safety into the public conscience and moved school safety onto the U.S. public agenda. Safety threats, once thought to be only an urban problem, are a concern for urban, rural, and suburban areas alike.

Although schools are among the safest places for children to be, education policymakers and administrators continue to look for ways to protect students and staff.

One tool for keeping schools safe is the use of student searches. Students in U.S. public schools have the Fourth Amendment right to be free from unreasonable searches.

This right is diminished in the school environment, however, because of the unique need to maintain a safe atmosphere where learning and teaching can occur. Schools must strike a balance between the student's right to privacy and the need to maintain school safety.

The courts have recently expanded the right of school officials to conduct student searches, resulting in part from recent acts of school violence and heightened public scrutiny. A search that was illegal 20 years ago now may be a legal search.

Unfortunately, no definitive test exists for determining what constitutes a legal search. Moreover, what may be legal in one jurisdiction could be illegal in another locality because search law is so fact- and context-specific.
This vagueness leaves teachers, administrators, policymakers, and school security and law enforcement personnel wondering what constitutes a legal search of a student in a public school.

# Reasonable Suspicion

The Fourth Amendment to the U.S. Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

Before 1985, doubt existed about whether this right applied to students in the public schools. Schools argued that administrators acted *in loco parentis*—in the place of the parent—while students were at school. In 1985, the U.S. Supreme Court determined that the Fourth Amendment applies to students in the public schools (*New Jersey v. T.L.O.*, 1985).

The Court concluded, however, that the school environment requires an easing of the restriction to which searches by public authorities are normally subject. School officials, therefore, do not need probable cause or a warrant to search students.

The Court articulated a standard for student searches: reasonable suspicion. Reasonable suspicion is satisfied when two conditions exist: (1) the search is justified at its inception, meaning that there are reasonable grounds for suspecting that the search will reveal evidence that the student has violated or is violating the law or school rules, and

(2) the search is reasonably related in scope to the circumstances that justified the search, meaning that the measures used to conduct the search are reasonably related to the objectives of the search and that the search is not excessively intrusive in light of the student's age and sex and the nature of the offense.

In *New Jersey v. T.L.O.*, a teacher's report of a student smoking in the bathroom justified a search of the student's purse. Since this landmark decision, several cases have debated what constitutes reasonable suspicion:

• Four students huddled together, one with money in his hand and another with his hand in his pocket, does not provide reasonable suspicion (*A.S. v. State of Florida*, 1997).

• An anonymous phone call advising an administrator that a student will be bringing drugs to school, coupled with the student's reputation as a drug dealer, creates reasonable suspicion to search the student's pockets and book bag (*State of New Hampshire v. Drake*, 1995).

• A report made by two students to a school official that another student possesses a gun at school constitutes reasonable suspicion to search the student and his locker (*In re Commonwealth v. Carey,* 1990).

• An experienced drug counselor's observation of a student who appears distracted and has bloodshot eyes and dilated pupils justifies taking the student's blood pressure and pulse (*Bridgman v. New Trier High School District No. 203,* 1997).

• The fact that the search of all but one student in a class fails to reveal allegedly stolen property gives school officials reasonable suspicion to search that student (*DesRoches v. Caprio,* 1998).

• The odor of marijuana in the hall does not provide reasonable suspicion to search all students' book bags, purses, and pockets (*Burnham v. West*, 1987).

Although the legal standard for reasonable suspicion is clear, the application of it in different contexts is not always as clear. The Court has even noted that articulating precisely what reasonable suspicion means . . . is not possible.

Reasonable suspicion is a commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. (*Ornelas v. United States*, 1996, at 695)

# Probable Cause and Student Consent

School officials need only reasonable suspicion to search students in public schools, but sworn law enforcement officials normally must have probable cause to search students.

Probable cause to search exists when "known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband . . . will be found" (*Ornelas v. United States*, 1996, at 696). But are law enforcement officials assigned to schools to maintain safety subject to the reasonable suspicion standard or the higher probable cause standard?

The answer depends on whether the court views law enforcement personnel assigned to the school as school officials or law enforcement officials.

When the police or school administrators act at one another's request, they run the risk of becoming one another's agents.

Such a relationship could change the standard necessary to conduct a student search. Some courts treat police officers as school officials subject to the lower standard of reasonable suspicion when they search students at the request of school administrators (*In the Interest of Angelia D.B.*, 1997).

Other courts hold that school officials conducting a search on the basis of information from the school resource officer are acting as agents of the police and are, therefore, subject to the higher standard of probable cause (*State of New Hampshire v. Heirtzler*, 2000).

The mere presence of a sworn law enforcement officer during a search by a school administrator does not trigger the need for probable cause (*Florida v. D.S.*, 1996).

School officials and sworn law enforcement officers may conduct a search without reasonable suspicion or probable cause if the student voluntarily consents to the search.

Voluntariness is determined on the basis of the circumstances—including the student's age, education level, and mental capacity—and the context of the search. When consent is granted, officials may conduct the search only within the boundaries of the consent. If a student consents to the search of her purse, for example, an administrator may not search her locker unless the search of the purse provides probable cause or reasonable suspicion to search the locker.

School officials and law enforcement officers are not required to advise students that they have a right to refuse to give consent to search. Some school policies or state regulations, however, may require that they advise students of their rights.

Some school policies require students to provide consent to a search or risk discipline. In at least one federal circuit, the court has upheld this policy (*DesRoches v. Caprio*, 1998).

In this case, all but one student consented to a search of their personal belongings. The search of the consenting students revealed nothing. Pursuant to school board policy, DesRoches was suspended for 10 days for failure to consent to the search.

The student claimed that his Fourth Amendment rights were violated because the administrator did not have reasonable suspicion to search him. The court held that when the search of all other students in the class failed to reveal the stolen item, the administrator had reasonable, individualized suspicion to search DesRoches.

Therefore, his discipline for failing to consent to a legal search was upheld.

# Individual Versus Random Searches

School officials conduct individual searches when they suspect that a student or a small group of students possesses evidence of a violation of the law or school rules. Such searches are subject to the reasonable suspicion standard.

Officials conduct random or blanket searches not because of individualized suspicion, but as a preventive measure. Examples of random searches include the use of metal detectors in school entrances and sweeps of parking lots and lockers. The legality of a random search depends on whether the school has a compelling interest or special need that warrants the use of a search without suspicion.

The most common need articulated by schools is the prevention of drug abuse. Perhaps the most controversial random search is the use of drug-sniffing dogs in schools.

The right of school officials or police to use dogs to detect drugs in students' belongings is well established. In fact, most courts conclude that such detection is not a search because the dogs merely sniff the air around the property and that students do not have an expectation of privacy in the air around their belongings.

One federal court has recently held that the use of drug-sniffing dogs on a student's person requires individualized, reasonable suspicion. Prevention of drug abuse, according to this court, does not justify the dog sniffing the person because it intrudes on the expectation of privacy and security (*B.C. v. Plumas Unified School District*, 1999).

This case changed practices in many school districts—those schools no longer use the dogs to sniff around students.

Drug-testing programs are another form of a random search. In 1995, the Supreme Court upheld a drug-testing program for student athletes because the school had a documented drug epidemic; participation in athletics was optional; the athletes had a lessened expectation of privacy because they participated in communal showering; the athletes had a heightened risk of injury; the athletes were the leaders of the drug culture; the testing procedure was minimally intrusive; and the consequence of a positive test was not discipline but treatment (*Vernonia School District 47J v. Acton*, 1995).

As schools try to expand drug-testing programs beyond the facts in *Vernonia*, courts have struggled in a number of cases to determine what is constitutional:

- *Todd v. Rush* (1998) and *Miller v. Wilkes* (1999) upheld drug testing for students participating in any extracurricular activity.

- *Willis v. Anderson* (1998) struck down drug testing for students suspended for certain disciplinary infractions such as fighting.

- *Joy et al. v. Penn-Harris Madison School Corporation* (2000) upheld a drug testing program for students who drive to school or engage in extracurricular activities.

- *Earls v. Board of Education of Tecumseh Public School District* (2001) struck down a drug-testing policy for students participating in extracurricular activities because no special need existed other than for athletes. The opinion notes, however, that schools need not wait until drug use is epidemic before implementing a testing program.

- *Tannahill v. Lockney Independent School District* (2001) struck down a drug-testing policy for all middle and high school students for lack of a compelling state interest (there was no documented drug abuse program for students in this locality).

Until the Court provides guidance on drug-testing programs beyond the facts of *Vernonia*, schools should consider the following questions before instituting a drug-testing program: How serious is the drug problem in the tested population? Have less intrusive means to combat the problem been exhausted?

Did parents give consent to the search? Is the testing procedure reliable and minimally intrusive? Are the consequences of a positive search result discipline, denial of privileges, or treatment?

The primary purpose of student searches is to maintain a safe learning environment. Discipline and conviction are two secondary purposes. Usually, law enforcement personnel conduct searches to reveal evidence of a violation of the law.

The seized evidence then can be used in a criminal trial to convict the student of a crime. School administrators conduct a search to gather evidence for school discipline. At times law enforcement and school administrators may, therefore, have different purposes for a potential search. One crucial difference in their purposes is the ability to use the results of an illegal search in a disciplinary hearing but not in a criminal proceeding.

School administrators face severe threats to school safety and are simultaneously held increasingly accountable to the public and policymakers to keep students safe. To keep schools safe, most administrators err on the side of searching rather than not searching. Administrators' judgments are protected by governmental immunity as long as the search is not knowingly or willfully illegal.
In fact, an administrator will not incur civil liability unless his or her conduct violates clearly established statutory or constitutional rights (*Harlow v. Fitzgerald*, 1982).

Immunity is not dependent on whether the actual search violated the law but rather on the objective reasonableness of the search. Immunity protects administrators acting in good faith in a gray area of the law.

# Preventive Search

As school practitioners navigate the murky waters of school searches, two practices may help successfully avoid legal challenge: debriefing and policy.

## *Debriefing*

After a search, administrators should meet with those individuals who are involved. Record and reflect on the crucial areas of the search and learn from the reflection.

This exercise may be invaluable if the search is subsequently challenged. Document the names of the people who conducted the search; the background of the student who was searched; the alleged infraction; the way the school learned of the infraction; the basis for the search (for example,

how reasonable suspicion, probable cause, or consent was obtained); the time and location of the search; the names of the people who were present at the search; and the school policies that were implicated and followed.

School officials should also note whether the police were involved or present during the search.

# Policy

The best search policies are developed by school boards who work collaboratively with local law enforcement officials, local judges and attorneys, school staff, and community members. A sound policy can make the difference between a legal or illegal search.
Sound school search policies should have a mission statement: to maintain a safe learning environment. They should outline techniques for searching students, from the least intrusive to the most intrusive means (metal detectors, canines, breath tests, urine tests, pat downs, strip searches), and they should describe the types of searches students may be subjected to while on school property or at a school function (locker searches, automobile searches, personal belongings, and personal searches).

The policies should explain what happens to seized possessions; define consent searches and note how consent may be obtained and the consequences for failing to provide it; state that lockers and other school property are provided for students' use, are under the school's control, and are subject to search at all times; and require that students and parents acknowledge that they have read and understood the school search policy.

Good policies can guide educators' actions, but school staff members need to remember that what constitutes a legal student search depends upon the context.

Despite the lack of clarity about whether to apply reasonable suspicion or probable cause in different situations, courts are more willing now than ever to find student searches legal to preserve safety.

In the final analysis, school personnel should balance the student's expectation of privacy with the school's unique need to create and preserve a safe learning and working environment.

The Fourth Amendment protects you against unreasonable searches and seizures. Does this apply to students at school? Yes. Does it mean that your locker or back packs are off-limits to school personnel? No.

Your school has a responsibility to you and the community to provide you with an education in a safe environment, and to maintain order in the classroom and on campus. This can only be done when problems are kept to a minimum at school. Keeping guns, gangs, drugs, and violence out of schools

has become a priority across the nation. Strict rules regarding these activities are legal and enforceable.

The Gun-Free Schools Act of 1994 mandates expulsion from any school receiving federal funds (which includes most public schools) for bringing or possessing a firearm at school.

A substantial number of sixth- to twelfth-grade students report high levels of violent crime, weapons, and gangs in their schools. Nearly all students are aware of incidents of bullying, physical attack, or robbery at school.

Whether as victims or witnesses, students are equally likely to worry about school violence. The Safe Schools Act of 1994 provides funding for conflict resolution and peer mediation programs in schools. The courts have also addressed the issue of safety at school through a number of cases.

The leading case on this subject is New Jersey v. T.L.O., the 1985 U.S. Supreme Court decision that set the standard for school search and seizure policy. At a New Jersey high school, a teacher caught T.L.O.* a freshman girl smoking in the bathroom. The girl was taken to the principal's office, where she denied everything. The assistant principal demanded to see her purse and proceeded to open and search it.

He found a pack of cigarettes, a small amount of marijuana, a marijuana pipe, empty plastic bags, a substantial number of $1 bills, an index card listing students who owed her money, and two letters that suggested she was dealing drugs. When the girl confessed to the police that she had been selling marijuana at school, she was charged and placed on probation.

The court debated whether the search of her purse was a violation of the Fourth Amendment. The court ruled that a school official may conduct a search of a student if there is a "reasonable suspicion" that a crime has been or is in the process of being committed, or that a school rule has been broken.  Since T.L.O. was seen smoking but denied it, the principal had reasonable suspicion to conduct the initial search of her purse. Then when he found not only cigarettes but marijuana he was justified in continuing to search for contraband.

"Reasonable suspicion" means more than a hunch that you're up to something unlawful or are about to break a school rule. Based on a totality of the circumstances—time, place, activity, your school record, age, and source of information—the search may pass the reasonable suspicion test.

Although the court recognized that students have privacy rights at school, these rights are balanced with the school's need to maintain an environment where learning can take place. The court held that the standard to be applied in school searches is that of reasonableness. This covers not only your person, but your locker, desk, car, and backpack. Some cases have extended the search to off-campus incidents, if reasonably related to the school.

The Court also stated in T.L.O. that "A teacher's focus is, and should be, on teaching and helping students, rather than on developing evidence against a particular troublemaker."

Schools are going to great lengths to provide a safe school environment. You may have seen metal detectors and uniformed police officers at your school, on city buses, and at school events.

School resource and D.A.R.E. (Drug Abuse Resistance Education) officers are being assigned to elementary through high schools in a national campaign against drugs and violence at school. Some high schools are using drug-sniffing dogs to randomly check student lockers.

Fifth Amendment Right at School?

If you find yourself in a search situation at school, the principal and teachers have a right and a duty to question you. When you hear someone say they're "taking the Fifth," this doesn't apply at school unless the police are called in and the person is taken into custody. The "Fifth" here refers to the Fifth Amendment.

It means that you don't have to say anything that would help the police charge you with an offense; you have the right to remain silent if charges are filed against you. School officials, however, aren't police officers. They have the authority to investigate school violations, and they can question you.

In another case, the North Dakota Supreme Court ruled in April, 2012 that a school resource officer only needs reasonable suspicion of unlawful behavior to conduct a search of a student. In this case, Christian Alaniz, Jr., age 18, was seen in an area known for drug activities. He was brought to the principal's office and asked to empty his pockets.

When he did, a glass pipe and synthetic marijuana was found. Alaniz pleaded guilty and challenged the search on appeal. However, the court upheld the search as constitutional stating that "The search was not excessively intrusive in light of Alaniz's age, gender, and nature of the suspicion. . . .The search was reasonable."*

Similar cases include:

o An 11-year-old South Carolina sixth grader brought a steak knife to school in October, 1996. Although it seemed to be an accident (she was helping her mom pack her lunch), she was suspended from school and charged with possessing a weapon on school grounds. The charge was dropped a few weeks later, and she returned to school.

o In Ohio, 14-year-old Kimberly gave her 13-year-old friend Erica some Midol at school. Kimberly was suspended for 14 days for distributing drugs, and Erica for 9 days for possession. TIP: Give all drugs—including prescription drugs and over-the-counter medications—to your school nurse!

*State of North Dakota v. Alaniz, 2012 WL 1173764 , ___N.W.2d ___.

Strip Search of Student by School Officials

In 2003, Savana was a 13-year-old 8th grade girl in Safford, Arizona. She was strip searched in the nurse's office with two other female school personnel in the room. They were looking for pills that she allegedly had with her and was giving out at school. None were found.

A federal court ruled in July, 2008 that the search violated her Fourth Amendment right against unreasonable searches and seizures.

The court stated in its opinion: "It does not take a constitutional scholar to conclude that a nude search of a 13-year-old girl is an invasion of constitutional rights. More than that: it is a violation of any known principle of human dignity."  (Redding v. Safford Unified School District, 9th Circuit Court of Appeals).

Update:  The school district didn't like the court's decision and asked a higher court to review it. In April, 2009, the Supreme Court heard arguments in the case and in June, 2009, agreed that the search was unreasonable and that Savana's 4th Amendment rights were violated. Savana's six-year battle will end when she reaches an agreement with the school district regarding a monetary settlement.

Related case:  In 2012, over 200 high schools in England, Scotland and Wales placed cameras in bathrooms and locker rooms. Just the doors to the stalls and sink areas are videotaped with the goal of reducing bullying incidents and in the interest of student safety. The videos are viewed by school officials only when a problem is reported and are kept for up to thirty days. In these countries, such a measure is legal whereas in the United States, the issue is one of "expectation of privacy" and the Fourth Amendment. What do you think about this step to ensure your on-campus safety? Is this going too far?

21.   Plaintiff direct this Honorable Court to the following, not trying to violate rule 8, simply pleading this significant cause and seeking Justice,

BURNHAM v. WEST

Email | Print | Comments (0)
Civ. A. No. 87-0464-R.

_____

681 F.Supp. 1160 (1987)

*Forrest BURNHAM, et al., Plaintiffs, v. Roy A. WEST, et al., Defendants.*

United States District Court, E.D. Virginia, Richmond Division.

December 28, 1987.

*Attorney(s) appearing for the Case*

*David P. Baugh, Claire G. Cardwell, Gerald T. Zerkin, Michael P. Kozak, Zerkin, Heard & Kozak, and Kay Ely-Pierce, Richmond, Va., for plaintiffs.*

*Frank B. Miller, III, Elizabeth Parrish, Sands, Anderson, Marks & Miller, Richmond, for defendant Harrison-Jones.*

*James W. Morris, III, Ann Adams Webster, David P. Corrigan, Browder, Russell, Morris & Butcher, Richmond, Va., for Roy A. West, Joyce P. Hewlett, Andrew Miller, Ozzie W. Brown, and Margaret L. Jones.*

MEMORANDUM OPINION AND ORDER

SPENCER, District Judge.

Plaintiffs, students at Albert Hill Middle School ("AHS") suing by their next friends, have moved for summary judgment in their favor on the two remaining claims in this suit, both of which concern allegedly unconstitutional searches carried out by certain teachers at the direction of Dr. Roy A. West, principal at AHS during the time period pertinent to this case.[1] West and the named teachers (the "AHS defendants") have moved for summary judgment in their favor as to liability for one of the searches, and as to damages and declaratory and injunctive relief. Dr. Lois Harrison-Jones, the remaining defendant and West's supervisor, has moved for summary judgment on the ground that the evidence fails to show sufficient personal involvement on her part to support a claim against her. The facts will be stated in connection with the motion to which they pertain.

I. MOTION OF DR. LOIS HARRISON-JONES

In January 1987, Harrison-Jones was made aware by at least three parents that students at AHS had been searched for "Walkmen" and radios.[2] Harrison-Jones promptly contacted West, asked him to explain his action in ordering the search, and discussed with him both the search and the question of returning the items that had been confiscated.

All or a substantial portion of the AHS student body was subsequently searched for marijuana.

When Harrison-Jones learned of the later search, she met with West to discuss his policies concerning searches. Harrison-Jones subsequently sent West a letter advising him to obtain enough information to be able to confine his searches to a narrower population in the future.

At some point in the period encompassing the above events, Harrison-Jones discussed the searches with attorneys connected with the school system.

Supervisory indifference or tacit authorization of subordinates' misconduct, if demonstrably a causative factor in a constitutional injury,[3] is actionable under 42 U.S.C. section 1983. *E.g., Slakan v. Porter,* 737 F.2d 368 (4th Cir.1984), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985).

"The plaintiff ... assumes a heavy burden of proof in supervisory liability cases." *Id.* at 373. One of the necessary elements of proof in such cases is the supervisor's failure to take reasonable remedial steps to prevent the injury. *Orpiano v. Johnson,* 632 F.2d 1096, 1101 (4th Cir.1980), *cert. denied,* 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981).

The additional necessity of showing a causal link between the supervisor's inaction and the injury is what makes plaintiff's burden "heavy"; it is not enough merely to disagree with the supervisor's managerial techniques. *See Slakan,* 737 F.2d at 372-73; *see also Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976) ("affirmative link"); *Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir.1987) (action *or inaction* must be shown to have caused the injury).

Valuable guidance on the necessary causal link may be found in *Spell v. McDaniel,* 824 F.2d 1380 (4th Cir.1987). *Spell* is a municipal liability rather than a supervisory liability case, but in recognizing foreseeability as the touchstone of causation *Spell* simply aligns itself with one of the ancient principles of tort law.

A sufficiently close causal link between ... a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom....
[F]ailure to correct the known practices must be such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.

824 F.2d at 1391. Applied in the case at bar, this standard has the virtue of focusing analysis on Harrison-Jones's connection with the alleged injury as revealed in the record, thus avoiding speculation about the possible effect of actions that she might have taken. Plaintiffs contend that "[t]he basis of plaintiffs' claim against defendant Harrison-Jones is not that she failed to respond at all, but that she failed to act significantly or effectively to prevent future harm...." (Plaintiffs' Reply Br. 7).

In essence, this amounts to saying that because an injury happened, Harrison-Jones must have acted inappropriately, which obviously begs the question of how any such act or omission caused the injury. Plaintiffs

have utterly failed to show how Harrison-Jones's actual approach to the situation made further violations reasonably probable.

Plaintiffs have also failed to point to evidence of any indifference or tacit approval on Harrison-Jones's part. In support of her summary judgment motion, Harrison-Jones has shown that she promptly investigated the searches in question, inquired into West's policies concerning student searches, discussed the searches with legal counsel, and recommended to West that he narrow the scope of future searches by conducting more extensive investigations beforehand.

The latter recommendation was made by letter, and while the parties have failed to produce this letter, both West and Harrison-Jones have described its contents in their sworn depositions as provided in Fed.R.Civ.P. 56.

"[W]hen a motion for summary judgment is made and supported as required in Rule 56, the nonmoving party must produce `specific facts showing that there is a genuine issue for trial,' rather than resting upon the bald assertions of his pleadings."

*Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985) (quoting Fed.R. Civ.P. 56(e)). Because Harrison-Jones has established the absence of a material factual dispute as to inaction on her part,[5] and as to causation, she is entitled to summary judgment.

# II.  MOTION OF PLAINTIFFS

*Facts*

In December 1986, during a regular class period at AHS, West announced that he had discovered defacement of school property, and directed the teachers to search students' book bags, pockets, and pocketbooks for magic markers. Under an AHS rule, students were not permitted to have magic markers on school property unless the magic markers were required in a particular class.

Teachers proceeded to look into book bags and pocketbooks, and required boys to turn their pockets inside out. There is no evidence that any student was physically touched during the search.

On or about January 6, 1987, a teacher told West that she had observed several students alighting from school buses that morning carrying "Walk men" or radios. Without making any further inquiry, West ordered a search of all students' book bags and pocketbooks for Walk men or similar devices.

A search was conducted pursuant to West's instructions. One teacher told his students to stand by their desks and place the items in their book bags and purses on top of their desks. He then looked into the emptied purses. Another teacher placed her hand into a plaintiff's purse, but did not find the Walkman that was inside.

On or about February 2, 1987, a teacher reported to West that she had smelled marijuana smoke in two hallway areas near the school cafeteria. Classes were in progress at this time, and no students were in the halls. West went immediately to the hallway areas and detected a strong odor of marijuana in both. West's description of the physical layout of the pertinent areas is significant.

Q Could you detect the odor in both places? A Both places.
In between there is a large area which is the cafeteria. You would leave one area and go through the cafeteria and to the other area. Q There was a door from the outside into the cafeteria directly? A The door comes from the outside into this little vestibule or hallway, and that's where I smelled the second portion of the marijuana.

(West Dep. 59). West looked for physical evidence but found none. West then made a "random check" by walking down the hall and asking several teachers whether they had excused any students from class during the period he had determined the marijuana use had occurred; although AHS uses a hall pass system, this effort produced no suspects.

There is no evidence that passes were checked or that any further pre-search investigation was made.

West ordered a search of all students' pocketbooks and bookbags, and of male students' pockets. During this search, one of the plaintiffs was required to empty her purse onto a teacher's desk, exposing some tampons to the view of the teacher and nearby students.

Another teacher sniffed one student's hands to determine if they smelled like marijuana. Students were required to turn their pockets inside out and place the contents on top of their desks.

# DISCUSSION

Two matters must be addressed before turning to the merits of plaintiffs' Fourth Amendment claims. First, the AHS defendants made the claim at oral argument that no Fourth Amendment "searches" occurred in this case. However, "an examination of the contents of a person's pocket is clearly a search, whether the pocket is emptied by the officer or by the person under the compulsion of the circumstances."

*United States v. DiGiacomo,* 579 F.2d 1211, 1215 (10th Cir.1978). School children have a reasonable expectation of privacy in personal articles

carried with them inside purses or wallets. *New Jersey v. T.L.O.,* <u>469 U.S. 325</u>, 339, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985).

There is no rational basis to exclude bookbags from this zone of protection; certainly the *T.L.O.* Court suggested no distinction in this regard. *Id.* at 337, 105 S.Ct. at 740 ("closed purse *or other bag*"; emphasis added). Such articles have uniformly been held to be protected by the Fourth Amendment. *See, e.g., United States v. Epperson,* <u>454 F.2d 769</u>, 770 (4th Cir.), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972) (briefcase).

The occasions on which plaintiffs were required to empty their purses, book bags, and pockets, exposing the contents to view, were "searches" within the meaning of the Fourth Amendment.

The sniffing of plaintiff Tarsha Page's hands, however, was not a "search." School children do not have a reasonable expectation of privacy in the air surrounding their persons, and school officials may sample this air for the purpose of maintaining a proper learning environment to the same extent that they would be justified in conducting a purely visual inspection.

*Doe v. Renfrow,* <u>475 F.Supp. 1012</u>, 1021-22 (N.D.Ind.1979), *aff'd,* <u>631 F.2d 91</u> (7th Cir.1980), *cert. denied,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981); *see generally Jones v. Latexo Independent School District,* <u>499 F.Supp. 223</u>, 232-33 (E.D.Tex.1980) (suggesting that sniff by school officials instead of canines would not have been a search). Defendants will be granted summary judgment with regard to the hand-sniff incident.

Second, the AHS defendants point out in their summary judgment motion that Forrest Burnham, the only plaintiff allegedly subjected to a magic marker search, testified at his deposition that he was not searched for magic markers.

In response, plaintiffs have submitted Burnham's affidavit to the effect that he misunderstood the questions at his deposition and that he was searched for magic markers. The conflict between Burnham's deposition testimony and his affidavit poses a credibility question going to the material issue of standing.

Credibility questions must be resolved by the trier of fact, not by the Court on summary judgment. *See, e.g., Kennett-Murray Corp. v. Bone,* <u>622 F.2d 887</u> (5th Cir.1980) (conflict between deposition and affidavit on material issue). Plaintiffs' summary judgment motion will therefore be denied as to the magic marker search.

"[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable...." *T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 740. The searches in the case at bar were all conducted in an atmosphere devoid of individualized suspicion.

The United States Supreme Court has not decided whether individualized suspicion is a necessary component of the reasonableness standard applicable to school searches,[6] but it has strongly suggested that this question should be answered by recourse to the same reasonableness balancing analysis applied in other search cases.

Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where other safeguards are available to assure that the individual's reasonable expectation of privacy is not `subject to the discretion of the official in the field.'

*Id.* at 342 n. 8, 105 S.Ct. at 743 n. 8 (quoting *Delaware v. Prouse,* 440 U.S. 648, 654-55, 99 S.Ct. 1391, 1396-97, 59 L.Ed.2d 660 (1979)). The Fourth Amendment interest-balancing process may, in some cases, entirely preclude insistence on individualized suspicion. *Prouse,* 440 U.S. at 654-55, 99 S.Ct. at 1396-97.

However, reduction of the individualized suspicion requirement in such cases is only possible because other variables in the reasonableness equation have been correspondingly magnified. *See, e.g., Marshall v. Barlow's, Inc.,* 436 U.S. 307, 321, 98 S.Ct. 1816, 1825, 56 L.Ed.2d 305 (1978); *United States v. United States District Court,* 407 U.S. 297, 322 and n. 20, 92 S.Ct. 2125, 2139 and n. 20, 32 L.Ed.2d 752 (1972); *Camara v. Municipal Court,* 387 U.S. 523, 537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967).

In school cases, the child's interest in privacy balances against the interest in maintaining discipline in the classroom and on school grounds. *T.L.O.,* 469 U.S. at 339, 105 S.Ct. at 741.

A search of a "closed purse or other bag" carried on a child's person, "no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." *Id.* at 337-38, 105 S.Ct. at 740-41.

These expectations of privacy on the part of a school child are legitimate. *Id.* at 338-39, 105 S.Ct. at 741. Equally legitimate is the school's "need to maintain an environment in which learning can take place." *Id.* at 340, 105 S.Ct. at 742. But school officials may not unreasonably satisfy the latter need at the expense of the child's privacy interest, because the Fourth Amendment's "prohibition on unreasonable searches and seizures applies to searches conducted by public school officials." *Id.* at 333, 105 S.Ct. at 738.

To determine the reasonableness of the searches in this case, the Court must consider first "`whether the ... action was justified at its inception....'" *Id.* at 341, 105 S.Ct. at 743 (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)).

Under ordinary circumstances, a search of a student by a teacher or other school official will be justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. *T.L.O.* at 341-42, 105 S.Ct. at 743 (footnotes omitted).

The Walkman search was unjustified at its inception because there were no reasonable grounds to suspect that the search of any given student would turn up evidence of that student's violation of any law or school rule. At best, it would have been reasonable to suspect that some unknown members of the student body had Walkmen or radios in their possession.

The marijuana search illustrates even more clearly the unjustifiable nature of the sweep searches in this case, because suspicion in this instance could not reasonably be narrowed even to the entire student body. The scent of marijuana was reported to West while the students were in class, and when he investigated the hallways for himself the scent was still strong.

His cursory efforts to determine whether any student had left a classroom during the relevant time period led to no evidence that a student had been in the area.

In one of the hallways was a door to the outside. The places where the scent was detected were open hallways rather than confined areas to which only certain individuals had access, and the fact that these hallways led to the cafeteria indicates that nonstudents would reasonably be expected to use them during the time in question.

While the Court readily accepts the proposition that drug abuse is a serious problem, defendants have offered no evidence concerning its prevalence at AHS.

Smuggling Walkmen or radios into school is obviously a less serious problem than drug abuse, and there is likewise no evidence of its prevalence at AHS. Defendants have made no sufficient showing of exigency requiring an immediate search without particularized suspicion, while plaintiffs, on the other hand, have shown a striking paucity of investigatory measures reasonably calculated to narrow the field of suspects because the searches were unjustified *ab initio* for lack of individualized suspicion, the Court need not inquire into the actual search techniques used to assess the permissibility of their scope.

General searches have uniformly been condemned in the absence of other factors supporting reasonableness. *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (Supreme Court rejected general roundup of blacks in response to victim's description of assailant as black). Under the strong majority view, the Fourth Amendment requires individualized suspicion in the mass drug testing context generally. *Feliciano v. City of Cleveland,* 661 F.Supp. 578, 587-92

POLK VS SKYLINE EDUCATION, INC.                                    20

(N.D.Ohio 1987) (analyzing cases and holding general drug testing of police academy cadets unreasonable).

Individualized suspicion is even required in the prison setting, at least with regard to strip searches of visitors. *Hunter v. Auger,* 672 F.2d 668, 675 (8th Cir.1982) (reasonable suspicion must be aimed at the particular strip search candidate).

Finally, and most importantly, the balance this Court strikes in favor of individualized suspicion accords with the decisions that have addressed the issue in the school setting. *E.g., Horton v. Goose Creek Independent School District,* 690 F.2d 470, 481-82 (5th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983); *Jones v. Latexo Independent School District,* 499 F.Supp. at 234; *Bellnier v. Lund,* 438 F.Supp. 47, 54 (N.D.N.Y.1977); *Kuehn v. Renton School District No. 403,* 103 Wn.2d 594, 694 P.2d 1078, 1081 (1985).

Using *T.L.O.*'s footnote 8 as a point of departure, the AHS defendants urge this Court to adopt the rule that a school administrator's search is valid so long as he or she had reasonable cause to believe that a law or a school rule had been violated.

But this rule hardly furnishes an objective alternative to individualized suspicion that might safeguard the students' privacy interest.

Reasonable cause to believe — or even certainty — that a violation of rule or law has occurred is no safeguard; instead, when standing alone as in this case, it serves merely as an invitation to an impermissibly broad search.

"[T]he reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against `an objective standard,' whether this be probable cause or a less stringent test.

"*Prouse,* 440 U.S. at 654, 99 S.Ct. at 1400 (footnotes omitted); *accord Terry,* 392 U.S. at 21 and n. 18, 88 S.Ct. at 1879-80 and n. 18; *Bellnier,* 438 F.Supp. at 53. To permit searches on a mere generalized suspicion would vitiate the principles established in *T.L.O.,* because the bare suspicion that a crime or infraction has occurred offers no protection to the legitimate expectation of privacy held by each member of the student body, an expectation that *T.L.O.* teaches must at least be weighed in the balance.[8]

The general searches conducted at AHS are powerfully reminiscent of the general searches that the Fourth Amendment was enacted to prohibit.

*See generally Frank v. Maryland,* 359 U.S. 360, 362-65, 79 S.Ct. 804, 807-08, 3 L.Ed.2d 877 (1959) (describing pre-Revolutionary inception of Fourth Amendment protection as a response to writs of assistance).

The author of this opinion is not the first judge to be disturbed by this fact upon being confronted with a general search in the school setting. See *Doe v. Renfrow,* 451 U.S. 1022, 1026-28, 101 S.Ct. 3015, 3018-19, 69 L.Ed.2d 395 (1981) (Brennan, J., dissenting from denial of certiorari); *Jones v. Latexo Independent School District,* 499 F.Supp. at 234.

This Court will not, on the basis of a footnote, depart from a principle relied on for centuries; instead, it will follow that principle as soundly applied in the cases that have squarely considered general searches in the schools.

There was some discussion at oral argument about whether this case "trivializes the Constitution" in any respect, and these words, undoubtedly uttered sincerely and in good faith, still seem to linger over this case.

It is true that some of plaintiffs' claims have failed to survive rigorous legal scrutiny. But let no one imagine that the interests still at stake either trivialize the Constitution or are made to seem trivial thereby. Given the special setting of the public schools, it is not enough to say merely that the Fourth Amendment protects the rights of public school children.

We have the obligation to give life to the Constitution in our children's experience at every opportunity. "Example is the school of mankind, and they will learn at no other." Burke, *Letters on a Regicide Peace,* no. 1 (1796). It was not for antiquarian interest that the *T.L.O.* Court opened its Fourth Amendment analysis with the following.

The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all its creatures — Boards of Education are not excepted.

These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights.

That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.  469 U.S. at 334, 105 S.Ct. at 738-39 (quoting *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943)).

It might be expedient to allow a general search of students in a public school setting at the whim of the principal.

Such a result might indeed enhance the principal's stated goal of increased order in the school. However, neither the Constitution nor its primary guardian — the federal judiciary — should bow to expediency.

The constitutional rights of all citizens should be affirmed and protected in spite of any systemic discomfort created by mandating respect for those rights.

Even though it is easier and more effective, from a school administrator's point of view, to be able to authorize general searches without the burden of individualized suspicion, this Court finds no genuine, material issue of fact as to the claimed unconstitutionality of the searches under consideration, and holds that plaintiffs are entitled to summary judgment thereon.

Except for claims arising out of the magic marker search, plaintiffs' motion for summary judgment will be granted.

# III. MOTION OF THE AHS DEFENDANTS

The AHS defendants have moved for summary judgment in their favor on the magic marker claims. As explained above, plaintiffs' motion on the same subject must be denied because of a credibility issue arising in discovery, and defendants' motion will be denied for the same reason.

The remaining issues raised by the motion concern the relief to be granted in this case.

# QUALIFIED IMMUNITY

The AHS defendants are entitled to summary judgment on their claim of qualified immunity. This issue "turns on the `objective legal reasonableness' of the action[,] *Harlow* [*v. Fitzgerald*], 457 U.S. [800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)] ..., assessed in light of the legal rules that were `clearly established' at the time it was taken. [Id. at 818, 102 S.Ct. at 2738.]" *Anderson v. Creighton,* ___ U.S. ___, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

This Court's essential determination on the Fourth Amendment issue is that the individualized suspicion requirement of certain pre-*T.L.O.* cases considering school searches retains its vitality after *T.L.O.*

This determination cannot be taken as "clearly established" for the purpose of imposing monetary damages on the defendants because the issue has not been authoritatively decided by the United States Supreme Court, the United States Court of Appeals for the Fourth Circuit, or the Supreme Court of Virginia. *Wallace v. King,* 626 F.2d 1157, 1161 (4th

Cir.1980), *cert. denied,* 451 U.S. 969, 101 S.Ct. 2045, 68 L.Ed.2d 348 (1981).

The *T.L.O.* Court explicitly left this issue open. 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8. While the defendants must certainly be charged with knowledge that the Fourth Amendment protects students' legitimate privacy interests, plaintiffs have not shown to the requisite level of specificity that the defendants should have known that the actions taken in this case would violate those interests. *See Anderson v. Creighton,* ___ U.S. ___, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (in light of pre-existing law, particular action's unlawfulness must be apparent); *Jensen v. Conrad,* 570 F.Supp. 91, 102 (D.S.C.1983), *aff'd,* 747 F.2d 185 (4th Cir. 1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985) (same, applying Wallace standard for determining pre-existing law).

The AHS defendants' summary judgment motion will be granted as to qualified immunity against the federal and state claims.

## *Punitive Damages*

In the preceding section, it was determined that defendants cannot be charged with knowledge of the individualized suspicion requirement in the circumstances of this case.

It follows, therefore, that no jury could reasonably award punitive damages for disregarding such a requirement. In any event, plaintiffs have not pointed to sufficient evidence of defendants' "`reckless or callous indifference'" or "evil intent" to justify sending the issue to a jury. *See Cooper v. Dyke,* 814 F.2d 941, 948 (4th Cir.1987) (quoting *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)); *accord Giant of Virginia v. Pigg,* 207 Va. 679, 685-86, 152 S.E.2d 271, 277 (1967) ("conscious disregard of the rights of others").

Accordingly, there is no genuine dispute on this point and summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986).

## DECLARATORY AND INJUNCTIVE RELIEF

Having established that an unconstitutional search was carried out, plaintiffs are entitled to the declaration of rights sought in this case.

This Court has jurisdiction to give a declaratory judgment accordingly and to order any injunctive relief shown to be appropriate upon further proceedings. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also Ross v. Meese,* 818 F.2d 1132, 1135 (4th Cir.1987); *Wallace v. King,* 626 F.2d at 1161. Defendants motion will be denied as to declaratory and injunctive relief.

# IV.  ORDER

For the reasons stated above, it is hereby ORDERED as follows:

Plaintiffs' motion for summary judgment is GRANTED as to the "Walkman" and marijuana searches, but DENIED as to the magic marker search.

The motion of defendant Harrison-Jones for summary judgment is GRANTED.

The AHS defendants' motion for summary judgment is GRANTED as to the claims for compensatory and punitive damages and as to the hand-sniff incident, but DENIED as to all other matters.

In addition to proceedings on the magic marker claim, the desirability of injunctive relief, and any other matter necessary to a final determination of this cause, the AHS defendants are entitled to a hearing on the availability and amount of attorney's fees in this case under 42 U.S.C. section 1988.

A final judgment order incorporating this memorandum and the relief to be granted will be entered at the appropriate time.

22. Plaintiff has no doubt that my son has been racially profiled and not select6ed because of his association with or friendship with any of the other students that was called out of class, for Prince Charles has informed Plaintiff that he was, sitting by h8imselfr, and that there was no one else even sitting by him,…

23. Mrs. Weston is Caucasian and Prince Charles is African American, not suggesting any form of racial animus, simply stating the facts, and it is a certainty that Prince Charles did nothing to generate, provoke or earn a seizure of his person and a search of his Book bag, pants pockets and/or shoes.

************************************
## SECOND COMMON CAUSE – INSTITUTIONAL RACISM
****************************
24.    Plaintiff son is a victim of Micro Aggressive behavior and as such demands that this Honorable Court enforce every Anti-Discriminatory law within her jurisdiction and under her authority.

25.    Plaintiff will produce evidence that Defendants 1 & 2 intentionally and deliberately acted in concert to cause a subtle covert degree of micro aggressions and for this Plaintiff is seeking a favorable verdict.

26. **By Silvia L. Mazzula, PhD (Asst. Professor of Psychology at John Jay College of Criminal Justice, CUNY). Dr. Mazzula is also the President-Elect of the Latino Psychological Association of New Jersey.**

27.    Last month marked the 50th anniversary of Dr. Martin Luther King's "I Have a Dream" speech and across the U.S., many Americans proclaimed that Dr. King's dream had indeed come true. Perhaps many people believe this because overt acts of racism aren't as common and are typically frowned upon.

28.    **However, covert forms of racism are all too common.** These more subtle forms of racism are called "micro aggressions" and communicate hostile and racial insults. Micro aggressions are things said or done – many times unconsciously – that reflect a person's inner thinking, stereotypes and prejudices.

29.    They are difficult to recognize because they are brief, innocuous, and often difficult to see.  Why are they important to talk about?  **Because micro aggressions are pervasive and have a detrimental impact on people's psychological and physiological well-being. What kinds of micro aggressions do Latinas/os experience?**

30.    If you are Latina or Latino, you may have heard comments such as, "Wow, *you* speak so well… *You* are not like them… *You* are really smart… OR *You* are different and they will really like you." You might even be asked repeatedly where you are from if your first answer is a city or state in the U.S.

31.    The take away messages from these simple statements are clear for many of us who study micro aggressions and racism: You are not acting like *those* Latinas/os who don't quite behave like the "norm" – which essentially is referring to White Anglo-American.  After experiencing a micro aggression, you might wonder, "Were they giving me a compliment or telling me that people from my culture are less than" or "Were they really curious about where I live or were they telling me that I don't belong – that I'm not American?"

32.    As a Latina, I have heard similar comments over and over again- as a student, as a professional, and as a faculty member.   When you bring it up to someone, you might get responses similar to the ones I received in the past –  that you are overreacting, thinking too much about a simple statement, or bringing up the 'race card' when it wasn't there.  **Research tells us micro aggressions are an all too common experience for Latinas/os**

33.    My colleague, Dr. Kevin Nadal, and I recently presented a paper at the 2013 APA Convention on Latinas/os' experiences with microaggressions[1].  Our findings prove micro aggressions are very real experiences for many Latinos/as living in the United States. **Almost all of our participants, 98%, had experienced some type of micro**

**aggression within the last six months!** We also found that when people experience micro aggressions, they tend to *experience mental health issues like depression and a more negative outlook of the world.*

34.     When examining gender, ethnic background and place of birth, we found the following: Latina women experienced more microaggressions at work and at school than Latino men,

35.     Latinas and Latinos of Dominican descent experienced being eroticized and treated as a sexual object more than other Latinos,

36.     Puerto Ricans experienced being treated as second-class citizens or as criminals, more than any other Latino ethnic group,

37.     Young Latinos/as, and those with lower levels of education, experienced being invalidated more than older Latinos and those with more education, and

38.     Latinos/as born outside of the U.S. were more likely to be treated as inferior compared to Latina/os born here.

39.     Our study highlights how very real micro aggressions are for Latinos/as and how having multiple oppressed identities can increase the impact of these insidious acts. The challenge to end micro aggressions is a difficult and often painful task.

40.     Because we all have biases and prejudices, we can start by asking ourselves one simple question. ***Do I participate in micro aggressions in my day-to-day interactions & conversations?*** When we start to reflect on this question honestly and deliberately, we will begin put a stop to micro aggressions.  But, it must start within each one of us first.

41.     **How I personally check against micro aggressions**. I am conscious to not laugh or participate in racial or ethnic jokes that demean, stereotype, or "other" groups that are different than me (even like me).  When I'm feeling a little bold, I even point out to the "jokester" that they are being micro aggressive.  This also includes ending racist and micro aggressive jokes at my own dinner table. It may not be much, but it's one simple thing that I can actively do.

42.     Addressing micro aggressive acts can be difficult and taxing to your emotional well being, especially with your loved ones and in your professional lives.  Sometimes, it's helpful to first process the experience with someone who understands.  Speaking to someone who understands will not only help you think through what happened, but also help validate that what you experienced was real and that there is nothing wrong with *you*. [1] Micro aggressions were assessed with The Racial and Ethnic Micro aggressions Scale (REMS; Nadal, 2011).

43.    Nadal, K. L. (2011). The Racial and Ethnic Micro aggressions Scale (REMS): Construction, reliability, and validity. *Journal of Counseling Psychology, 58*(4), 470-480. doi: 10.1037/a0025193

44.    Plaintiff contends that this form of Discrimination is very real and so insidiously woven into American society that Defendants 1 & 2 acted quite naturally, however their apparent disinterest in accommodating Plaintiff was realized, felt and evidenced as solidified by the results of Plaintiff's visit to Defendants place of business

45.    Plaintiff is certain of what was felt, inferred and recognized. This pattern of Micro Aggressive behavior is not new, the behavior forced upon Plaintiff on November 12, 2013 is indicative of Discrimination and not that of prejudice, there is a defining difference between the two, yet Plaintiff emphatically declares that what he experienced was definitely Discrimination, note all of the similarities.

46.    **By Debra Roberts, PhD (Howard University) and Sherry Molock, PhD (George Washington University)** - - - *Several years ago, I was at a national psychological conference presenting several papers.  I was walking through the lobby wearing an Afrocentric mud cloth jacket when a woman came up to me, handed me her tote and asked me to take her luggage to her room.  I remember thinking, "She can't possibly think I am a staff person at the hotel because of my jacket" but I decided that I would take her luggage to her room. When she tried to tip me, I pointed to my conference badge with the presenter ribbon on it and replied: "Oh, that's not necessary; you and I are both attending the same conference."  The woman turned red, profusely apologized and tried to buy me dinner for the remainder of the conference.  –* Sherry Molock, PhD  Honest mistake or racist act?

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**SECOND COMMON CAUSE – INSTITUTIONAL RACISM**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

47.    Plaintiff contends that condescending micro aggressive statements such as how "articulate an African American may be" or asked if an African American student is "Black smart' or really smart?" are totally Discriminatory yet done each and every day, and it is this same mindset, attitude and sub level of professionalism that Plaintiff was greeted with.

48.    Plaintiff will prove that Defendants racist undertones were present and that Plaintiff was not just being overly sensitive?

49.    This detection may be extremely difficult for a non African American person to recognize or even understand, however the lack of recognition, understanding or comprehension does not negate the Constitutional rights of Plaintiff and for this cause, a **L**oud and **C**lear **C**orrective **M**essage must be sent out to Defendants.

50.     Plaintiff suggests that Defendants 1 & 2 have never been followed in a department store or have been pulled over numerous times for driving a beautiful vehicle, however these are realities that people of Color experience on a daily basis, and although Defendants are not the cause of the racial ills in our society, on November 12, 2013 Defendants did in fact cause damage and harm to Plaintiff.

51.     Plaintiff further argues that although as Americans we may not all be African American, you may have witnessed similar interactions happening to others around you.

52.     Plaintiff understands and is quite cognizant of the fact that Sometimes we don't know how we should respond to such incidents because they are more subtle and not overtly racist.  But sometimes people engage in covert racism, which can involve statements, and behaviors that are **more subtle or aversive**, where the person engaging in the behavior is not aware that the behavior is racist or discriminatory and would feel offended if you labeled it as such.

**53.**     These more subtle forms of racism are called micro aggressions, and the dangerous thing about micro aggressions is while they may be small intentional or unintentional offenses, **they can accumulate and become burdensome over time for those who experience them.**  One of the most insidious features of micro aggressions is that sometimes it is hard to confront because it is so subtle.  Because they tend to involve small incidences or indirect insults, it is easy for the perpetrators to dismiss or negate your perception that the behavior or comment was racist.

54.     However, for those who are the targets of such microaggressions, it is **important to acknowledge any discomfort** you may experience as a result of the perpetrator's comments and/or acts, cognitively and physiologically.

55.     Whether or not we are aware of it, our bodies respond to circumstances (including racism) in our surroundings.  We often think of stress as some vague thing that happens to us; but stress is actually defined as "our response to conditions or stimuli in the environment."

56.     These conditions or stimuli can be referred to as stressors, and Harvard University's Center on the Developing Child identifies three different types of responses to stressors that they refer to as *positive*, *tolerable* and *toxic.*

57.     A ***positive stress response*** includes behavior that is normal, and is also an essential part of healthy development.

58.    ***Tolerable stress responses*** activate the body's alert systems to a greater degree than the positive stress response, often due to more severe, longer-lasting events such as institutional racism.

59.    The last and most harmful, is the ***toxic stress response*** that often occurs when one experiences strong, frequent, and/or prolonged adversity.  This may include emotional/physical abuse, economic hardship, exposure to violence, and exposure to racism – whether the acts are overt or subtle.  Toxic stress has been linked to severe illnesses such as depression, autoimmune disorders such as lupus and Crohn's disease, and other disorders that compromise our physical and psychological well-being.

**60.**    Given the potentially harmful effects of these stressors, it is important to at least be mindful of our responses to these triggers.  There are healthy and unhealthy responses.  Among a host of healthy coping strategies at our disposal are **prayer and meditation**.  Regardless of our religious/spiritual beliefs, there is room for one or the other or both in our lives.  One particular form of meditation that seems to be getting a great deal of attention among researchers who study our response to stress is **mindfulness meditation**.

61.    *Mindfulness* is simply an awareness of what is happening in the moment, observing your thoughts and feelings without judging them.  Mindfulness meditation often involves sitting in a quiet space while focusing on your physical, physiological and/or emotional state.  Although it is not necessary to use any particular tools, many people find that music and/or guided instructions are helpful during this process.  Whether you are a novice or seasoned practitioner a number of free mindfulness meditations can be found online.

62.    *Meditation* has been linked to improved mood, decreased stress, and better immune function.  So, whether we are in the midst of observing race-based injustices on a national/global level or experiencing our own personal micro aggressions, the nature of our response is a key factor in preserving our physical and psychological health.

**63.**    In addition to practicing mindfulness and mediation, it can also be empowering to directly address micro aggressive behaviors.  Before responding, think about what is your goal.

**64.**    To express how the behaviors made you feel? To affect behavioral change?  Sometimes it may be important just to let the person know that you are offended by the behavior and that the behaviors/statements are unacceptable.

**65.**    At other times, the incident can be the catalyst for some important ongoing discussions about race and discrimination. However you decide to respond, remember: **micro aggressions are**

real, offensive and you can be empowered to respond to them in ways that maximize your mental and physical well being.

66. Plaintiff has elected to address this form and type of Discrimination, Plaintiff did in fact contact Defendants and Plaintiff has vehemently decided to pursue Justice and the protection of his Constitutional rights.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
## THIRD COMMON CAUSE – NEGLIGENT HIRING
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

67.     Plaintiff is fully aware that it may not be Defendants written policy to ignore, violate or intentionally discriminate against Consumers of Color, however other than the Ku Kux Klan, Plaintiff is unaware of any written policy that DENGRATES AND OPENLY ADVOCATES DISCRIMINATORY POLICIES.

68.     Notwithstanding paragraph 52, Plaintiff is fully aware that the unwritten policies of America have often been Racist, Anti Semitic, Anti African American, Anti Female, and simply grotesque in scope, Note;

69.     Plaintiff is greatly pained by the intelligence insulting position of Defendants and is ever charged to pursue a the creation of a legal deterrent for Defendants to decrease the chances of another person having to experience Discrimination ignorance at the hands of Defendants.

70.     On Feb. 1, 1960, four stools at a Woolworth's lunch counter in Greensboro, N.C., sparked national media attention and lead to hundreds of subsequent sit-ins across the country. The immediate and impactful influence that these four African-American students had on the non-violence movement during the civil rights era is frequently praised, particularly during Black History Month. However, the enormous personal stress that they likely experienced as they occupied those stools is less often considered. In honor of the four African-American students and African-Americans across the diaspora, the *Ethnicity and Health in America Series* is raising awareness about the physiological and psychological impact of racism and discrimination as it relates to stress. The chronic condition of stress was selected because of its prevalence and impact on health within health disparity population groups (e.g., people of color), and their high association with many other chronic diseases.

71.     Although the chronic condition of stress can have negative side effects on all persons, the unique psycho-social and contextual factors, specifically the common and pervasive exposure to racism and discrimination, creates an additional daily stressor for African-Americans. Often, African-Americans do not realize daily stressors

POLK  VS  SKYLINE EDUCATION, INC.                                31

that may affect their psychological or physiological health and so we have compiled a collection of articles and additional resources to understand the health effects that result from exposure and perception of racism and discrimination.

72.    Two African-American psychologists have decades of experience and substantive knowledge in the field of mental health, in addition to significant experience working in African-American communities. A pioneer in his field, Jules Harrell, PhD, has been studying the physiological response to stress by African-Americans across the diaspora, particularly stressors, such as racism and discrimination. Harrell provides a framework on the physiological effect of stress as it relates to African-Americans and their experiences with racism and discrimination. In addition, he offers an historical overview of the examination of racism in psychology and concludes with solutions to reducing the physiological response that is harmful to produce positive health outcomes.

73.    Second, Shawn Utsey, PhD, is interested in understanding how race-related stress impacts the physical, psychological and social well-being of African-Americans. More recently, he has examined how trauma manifests in the victims of racial violence. In his featured article, Utsey discusses the ways in which culture and contextual resources can be used to cope and buffer against the deleterious effects of race related stress.

74.
This study tested a sociocultural model of stress and coping in a sample of 215 African-Americans. Psychological resources (optimism, ego resilience) were modeled as a "nested self" (S. E. Hobfoll, 2001), supported by social resources (family adaptability and cohesion) and cultural resources (racial pride, religiosity). Race-related stress was a significantly more powerful risk factor than stressful life events for psychological distress.

75.    Structural equation modeling results confirmed the hypotheses that psychological resources had a significant direct effect in minimizing psychological distress, and social resources had a significant stress-suppressing effect on race-related stress. Theoretical and practical implications for counseling psychologists are discussed. **Unmasking 'racial micro aggressions' Some racism is so subtle that neither victim nor perpetrator may entirely understand what is going on—which may be especially toxic for people of color.** By Tori DeAngelis, 2009, Vol 40, No. 2, Print version: page 42

76.    Two colleagues—one Asian-American, the other African-American—board a small plane. A flight attendant tells them they can sit anywhere, so they choose seats near the front of the plane and across the aisle from each another so they can talk.

```
*********************************
```
## FOURTH COMMON CAUSE — NEGLIGENT TRAINING
```
*********************************
```

77.    At the last minute, three white men enter the plane and take the seats in front of them. Just before takeoff, the flight attendant, who is white, asks the two colleagues if they would mind moving to the back of the plane to better balance the plane's load. Both react with anger, sharing the same sense that they are being singled out to symbolically "sit at the back of the bus." When they express these feelings to the attendant, she indignantly denies the charge, saying she was merely trying to ensure the flight's safety and give the two some privacy.

78.    Were the colleagues being overly sensitive, or was the flight attendant being racist?

79.    For Teachers College, Columbia University psychologist Derald Wing Sue, PhD—the Asian-American colleague on the plane, incidentally—the onus falls on the flight attendant.

80.    In his view, she was guilty of a "racial micro aggression"—one of the "everyday insults, indignities and demeaning messages sent to people of color by well-intentioned white people who are unaware of the hidden messages being sent to them," in Sue's definition. In other words, she was acting with bias—she just didn't know it, he says.

81.    Sue and his team are developing a theory and classification system to describe and measure the phenomenon to help people of color understand what is going on and perhaps to educate white people as well, Sue says.

82.    "It's a monumental task to get white people to realize that they are delivering micro aggressions, because it's scary to them," he contends. "It assails their self-image of being good, moral, decent human beings to realize that maybe at an unconscious level they have biased thoughts, attitudes and feelings that harm people of color."

83.    To better understand the type and range of these incidents, Sue and other researchers are also exploring the concept among specific groups and documenting how a regular dose of these psychological slings and arrows may erode people's mental health, job performance and the quality of social experience.

84. **Aversive Racism** - The term racial micro aggressions, was first proposed by psychiatrist Chester M. Pierce, MD, in the 1970s, but psychologists have significantly amplified the concept in recent years.

85.    In his landmark work on stereotype threat, for instance, Stanford University psychology professor Claude Steele, PhD, has

shown that African-Americans and women perform worse on academic tests when primed with stereotypes about race or gender.

86. Women who were primed with stereotypes about women's poor math performance do worse on math tests. Blacks' intelligence test scores plunge when they're primed with stereotypes about blacks' inferior intelligence.

87. Meanwhile, social psychologists Jack Dovidio, PhD, of Yale University, and Samuel L. Gaertner, PhD, of the University of Delaware, have demonstrated across several studies that many well-intentioned whites who consciously believe in and profess equality unconsciously act in a racist manner, particularly in ambiguous circumstances.

88. In experimental job interviews, for example, whites tend not to discriminate against black candidates when their qualifications are as strong or as weak as whites'. But when candidates' qualifications are similarly ambiguous, whites tend to favor white over black candidates, the team has found. The team calls this pattern "aversive racism," referring in part to whites' aversion to being seen as prejudiced, given their conscious adherence to egalitarian principles.

89. Sue adds to these findings by naming, detailing and classifying the actual manifestations of aversive racism. His work illuminates the internal experiences of people affected by micro aggressions—a new direction, since past research on prejudice and discrimination has focused on whites' attitudes and behaviors, notes Dovidio.

90. "The study of micro aggressions looks at the impact of these subtle racial expressions from the perspective of the people being victimized, so it adds to our psychological understanding of the whole process of stigmatization and bias," Dovidio says.

91. Research shows that uncertainty is very distressing to people, Dovidio adds. "It's the uncertainty of micro aggressions that can have such a tremendous impact on people of color," including on the job, in academic performance and even in therapy, he and others find.

92. **Creating a vocabulary** - Sue first proposed a classification of racial micro aggressions in a 2007 article on how they manifest in clinical practice in the *American Psychologist* (Vol. 2, No. 4). There, he notes three types of current racial transgressions:

93. **Micro assaults** - Conscious and intentional actions or slurs, such as using racial epithets, displaying swastikas or deliberately serving a white person before a person of color in a restaurant.

**************************************
## FIFTH COMMON CAUSE — NEGLIGENT RETENTION
**************************************

94.    **Micro insults** - Verbal and nonverbal communications that subtly convey rudeness and insensitivity and demean a person's racial heritage or identity. An example is an employee who asks a colleague of color how she got her job, implying she may have landed it through an affirmative action or quota system.

95.    **Micro invalidations** - Communications that subtly exclude, negate or nullify the thoughts, feelings or experiential reality of a person of color. For instance, white people often ask Asian-Americans where they were born, conveying the message that they are perpetual foreigners in their own land.

96.    Sue focuses on micro insults and micro invalidations because of their less obvious nature, which puts people of color in a psychological bind, he asserts: While the person may feel insulted, she is not sure exactly why, and the perpetrator doesn't acknowledge that anything has happened because he is not aware he has been offensive.

97.    "The person of color is caught in a Catch-22: If she confronts the perpetrator, the perpetrator will deny it," Sue says.

98.    In turn, that leaves the person of color to question what actually happened. The result is confusion, anger and an overall sapping of energy, he says.

99. **Refining the concept** - While Sue's 2007 American Psychologist article mainly laid out his theory and an initial taxonomy of micro aggressions, his team is now examining how these subtle communications vary among different populations.

100.    In a qualitative study in the June *Professional Psychology: Research and Practice* (Vol. 39, No. 3), Sue and his colleagues conducted focus groups with 13 African-Americans who discussed their perceptions of, reactions to and interpretations of micro aggressions, as well as the emotional toll they take.

101.    Participants, age 22 to 32, all lived in the New York metropolitan area and were either graduate students or worked in higher education.

102.    Respondents agreed that these backhanded communications can make them feel as if they don't belong, that they are abnormal or that they are untrustworthy. Some described the terrible feeling of being watched suspiciously in stores as if they were about to steal something, for instance. Some reported anticipating the impact of

their race by acting preemptively: One man noted how he deliberately relaxes his body while in close quarters with white women so he doesn't frighten them.

103.    Others cited the pressure to represent their group in a positive way. One woman said she was constantly vigilant about her work performance because she was worried that any slipups would negatively affect every black person who came after her.

104.    A similar study in the January 2007 *Cultural Diversity and Ethnic Minority Psychology* (Vol. 13, No. 1) found that many Asian-Americans cited the experience of people asking them where they were born or telling them they "spoke good English," which gave them the message that they are "aliens."

105.    Others described classroom experiences where teachers or students assumed they were great in math, which led to feelings of being trapped in a stereotype that wasn't necessarily true. Female participants complained that white men interested in dating them assumed they would be subservient sexual partners who would take care of their every need.

106.    "These incidents may appear small, banal and trivial, but we're beginning to find they assail the mental health of recipients," Sue says.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
## SIXTH COMMON CAUSE — NEGLIGENT SUPERVISION
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

107.    Other researchers are showing the harm of racial micro aggressions in a variety of arenas, though research in the area is still sparse, Sue acknowledges. For instance, in a 2007 article in *American Behavioral Scientist* (Vol. 51, No. 4), University of Utah social psychologist William A. Smith, PhD, and colleagues conducted focus groups with 36 black male students on five elite campuses, including Harvard and the University of Michigan.

108.    Participants reported experiencing racial micro aggressions in academic, social and public settings. For instance, some participants reported that when they went to their school's computer lab to do schoolwork, white students would call security to make sure they weren't there to cause trouble. When security arrived, they would check the students' IDs, sometimes asking them to provide a second one to prove the first was valid.

109.    In another case, fraternity students who had gathered for practice found themselves surrounded by police vehicles, the result of someone calling in a concern about gang activity, Smith notes.

110.    Meanwhile, in therapy, the more likely black people are to perceive their therapist using racial micro aggressions, the weaker the therapeutic bond and the lower their reported satisfaction, finds a 2007 study in the *Journal of Counseling Psychology* (Vol. 54, No. 1).

111.    Sue and other researchers are beginning to study the impact of racial micro aggressions on other groups as well, including people of various ethnic groups, people with disabilities, and gay, lesbian, bisexual and transgendered individuals.

112.    **Mountain or mole hill?** - Not everyone agrees that micro aggressions are as rampant or destructive as Sue says they are. In rebuttal letters to the 2007*American Psychologist* article, respondents accuse Sue of blowing the phenomenon out of proportion and advancing an unnecessarily negative agenda.

113.    "Implementing his theory would restrict rather than promote candid interaction between members of different racial groups," maintains Kenneth R. Thomas, PhD, of the University of Wisconsin-Madison, one of the critics. In the therapy relationship, for example, having to watch every word "potentially discourages therapist genuineness and spontaneity," says Thomas, who is white.

114.    Likewise, aspects of Sue's theory enforce a victim mentality by creating problems where none exist, Thomas asserts. "The theory, in general, characterizes people of color as weak and vulnerable, and reinforces a culture of victimization instead of a culture of opportunity," he says.

115.    Kenneth Sole, PhD, whose consulting firm Sole & Associates Inc., trains employees on team communication, agrees with Sue that micro aggressions are pervasive and potentially damaging. Indeed, clients talk about them all of the time, he says. But instead of encouraging their anger, he works with them on ways to frame the incidents so they feel empowered rather than victimized, he notes.

116.    "My own view is that we don't serve ourselves well in the hundreds of ambiguous situations we experience by latching onto the definition of the experience that gives us the greatest pain"—particularly in one-time encounters where one can't take more systemic action, he says.

117.    For instance, if a white person makes a potentially offensive remark to a person of color, the person could choose either to get angry and see the person as a bigot or to perceive the person as ignorant and move on, he says.

118.    For Sue's part, he believes it's important to keep shining a light on the harm these encounters can inflict, no matter how the person of color decides to handle a given encounter.

119.    "My hope is to make the invisible visible," he says. "Micro aggressions hold their power because they are invisible, and therefore they don't allow us to see that our actions and attitudes may be discriminatory." *Tori DeAngelis is a writer in Syracuse, N.Y.*

************************************
### SEVENTH COMMON CAUSE – VICARIOUS LIABILITY
************************************

120.    Plaintiff is aware that Defendants did not treat Prince Charles equal to or without a difference, the only fact that is known to Plaintiff is the fact that Prince Charles is an African American Male in a High School that is predominantly African American and l;ow income and there were no White Children called into the hallway or unlawfully searched.

121.    Plaintiff in and attempt to resolve this matter and avoid any undue procedures is in fact willing to offer Defendants an opportunity to resolve this matter, however Plaintiff is obviously prepared to take Defendants to task at Bar.

122.    Plaintiff directs the Court to note the pattern which seems to always appear with Discrimination against People of Color, to Wit a National Case involving the Denny's Restaurant, which bears a startling resemblance;

123.    **Plaintiff will prove that the "Suspicion, illegal searches and seizure of Prince Charles" was proven to be un justified for Defendants never spoke to or questioned Prince at all, "HE WAS JUST A BLACK KID IN THE ROOM, SO LETS SEARCH HIM BECAUSE WE MIGHT FIND SOMETHING, MOST BLACK KIDS ARE INVOLVED WITH DRUGS ANYWAY!"** Selecting Prince Charles for the Purported intervention against drug abuse among minors is no more than an excuse, a fabricated cover up for what Plaintiff has already proven, deliberate Discrimination.

124.    Prince Charles was removed from his class, which deprived him an education, denied the use of Defendants Phone to contact his Father and was illegally searched and seized, on the ground of race or color, Prince Charles Polk was denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of Defendants Educational Institution;

125.    Plaintiff was denied Education service, and/or was given less favorable terms and conditions of Education, to any person on the ground of race or color;

126.    Defendants made statements, on the ground of race or color that would discourage a reasonable person from ever visiting defendants' place of business.

127.    Defendants did instruct and encourage employees / staff members to violate Prince Charles Polk's Constitutional rights on the ground of race or color, from attending defendants educational facility or from enjoying the full benefits of defendants' School;

**128.**    Plaintiff did experience Defendant's form of differential education based on race or color, in fact Plaintiff experienced a 1 hour delay in Education based on race or color;

**129.    What is institutional racism?** "The collective failure of an organization to provide an appropriate and professional service to people because of their color, culture or ethnic origin which can be seen or detected in processes; attitudes and behavior which amount to discrimination through unwitting prejudice, ignorance, absolute thoughtlessness and racist stereotyping which disadvantages minority ethnic people."

**IN CONCLUSION;**

130. **There are several players in this production of fraud, negligence and constitutional violations, we have**
    A. **Math Teacher Ms. Weston that detected Marijuana and notified the Principal Ms. Brown, and Plaintiff applauds the quick drug abuse intervention, for drugs in the possession of minors is definitely not an environment Plaintiff desires for his child, Prince Charles Polk,**

    B. **We must carefully consider Mr. Sims, the former Correction officer that was asked to escort the children to the front office, and once there, was instructed to search Prince Charles Back Pack and he did, he searched the pant pockets of Prince Charles, and had Prince Charles remove his shoes and he searched them. These actions are in direct violation of Prince Charles Polk's Constitutional rights, in pertinent part; the 4th amendment,**

    C. **Then we have the Vice Principal Mr. Garcia, which instructed Mr. Sims to search Prince Charles, that had not been spoken to, that was never even asked did he have or know who had marijuana on them and was totally unlawfully and illegally seized for an unknown purpose and "Witch Hunt".**

131. **Plaintiff moves this court to remember as a silent fact that Plaintiff believes that Neither side disputes that Defendant receives federal funding. Title IX violation; and it is a fact that prince Charles experienced during his attendance, harassment and racial profiling as it were and as a result, he was deprived of his right to an education as he was called out of class for about an hour or more,**

denied the right to contact his father, and made to sit in the front office without ever being told why.

132. Prince Charles and his civil rights were violated and a violation of equal protection under § 1983; violation of due process under § 1983

133. The Supreme Court teaches that in Title IX claims that allege peer-on-peer harassment, a school district may be liable for damages when it acts with deliberate indifference to acts of harassment of which it actually knew[5] if such harassment "is so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 633, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

134. The deliberate indifference standard requires that the school official's response must be "clearly unreasonable in light of the known circumstances." *Id.* at 648, 119 S.Ct. 1661.

135. [W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.

136. Plaintiff is fully aware that to make a claim for damages under 42 U.S.C. § 1983, a plaintiff needs to show (1) a deprivation of a federal right (2) committed by an individual acting under color of law. *See Collins v. City of Harker Heights,* 503 U.S. 115, 120-21, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), so Plaintiff reserves the right to amend this complaint and seek leave of this Honorable Court to do so.

137. Plaintiffs is humble, considered and with an immediate desire to send a message to the world that "PEOPLE OF COLOR DO HAVE RIGHTS, THAT BLACK LIVES ACTUALLY MATTER AND IF A BLACK PERSONS CONSTITUTIONAL RIGHTS ARE VIOLATED THERE IS LEGAL RECOURSE THAT THE FRAMERS HAVE PENNED TO INSURE JUSTICE FOR ALL.

138. Plaintiff has faith in the system of Jurisprudence and believes that this Honorable Court will rule in favor of Plaintiffs argument,

139. Plaintiff has not overlooked Rule 8, but in hopes of clearly depicting the events as they occurred, plaintiff has taken the steps to paint the big picture,

140. For this cause and purpose, Plaintiff again reiterates his desire to resolve this matter as expeditiously as possible, considering the uncertainty of litigation and understanding what the school is actually

faced with as it pertains to Drug possession and abuse among minors within a public environment such as a school, however we must preserve the Constitutional rights of all Citizens of this great country, even if they are minor students.

141. We must Honor the constitution if we are to truly educate our youth, Prince Charles Immanuel Polk is not now or has he ever been involved with drugs in any capacity.

142. Plaintiff's Prayer,

### ON THE FIRST CAUSE OF ACTION

1. Statutory damages in excess of $125,000.00
2. Compensatory damages in excess of $125,000.00, and
3. Punitive damages in excess of $125,000.00, and
4. Cost of suit, and travel herein incurred, and
5. Such other relief that the court deems appropriate.
6. Interest thereon at the rate of 10% from the date of judgment until such time of judgment satisfaction.

### ON THE SECOND CAUSE OF ACTION

7. Statutory damages in excess of $125,000.00
8. Compensatory damages in excess of $125,000.00, and
9. Punitive damages in excess of $125,000.00, and
10. Cost of suit, and travel herein incurred, and
11. Such other relief that the court deems appropriate.
12. Interest thereon at the rate of 10% from the date of judgment until such time of judgment satisfaction.

### ON THE THIRD CAUSE OF ACTION

13. Statutory damages in excess of $125,000.00
14. Compensatory damages in excess of $125,000.00, and
15. Punitive damages in excess of $125,000.00, and
16. Cost of suit, and travel herein incurred, and
17. Such other relief that the court deems appropriate.
18. Interest thereon at the rate of 10% from the date of judgment until such time of judgment satisfaction.

### ON THE FOURTH CAUSE OF ACTION

19. Statutory damages in excess of $125,000.00
20. Compensatory damages in excess of $3500.00, and
21. Punitive damages in excess of $3,500.00, and
22. Cost of suit, and travel herein incurred, and
23. Such other relief that the court deems appropriate.
24. Interest thereon at the rate of 10% from the date of judgment until such time of judgment satisfaction.

POLK  VS  SKYLINE EDUCATION, INC.                    41

ON THE FIFTH CAUSE OF ACTION

25.  Statutory damages in excess of $125,000.00
26.  Compensatory damages in excess of $125,000.00, and
27.  Punitive damages in excess of $125,000.00, and
28.  Cost of suit, and travel herein incurred, and
29.  Such other relief that the court deems appropriate.
30.  Interest thereon at the rate of 10% from the date of judgment until such time of judgment satisfaction.


ON THE SIXTH CAUSE OF ACTION

31.  Statutory damages in excess of $125,000.00
32.  Compensatory damages in excess of $125,000.00, and
33.  Punitive damages in excess of $125,000.00, and
34.  Cost of suit, and travel herein incurred, and
35.  Such other relief that the court deems appropriate.
36.  Interest thereon at the rate of 10% from the date of judgment until such time of judgment satisfaction.


ON THE SEVENTH CAUSE OF ACTION

37.  Statutory damages in excess of $125,000.00
38.  Compensatory damages in excess of $125,000.00, and
39.  Punitive damages in excess of $125,000.00, and
40.  Cost of suit, and travel herein incurred, and
41.  Such other relief that the court deems appropriate.
42.  Interest thereon at the rate of 10% from the date of judgment until such time of judgment satisfaction.


RESPECTFULLY, SUBMITTED ON THIS 18TH DAY OF NOVEMBER, 2016

HILLARY CHARLES POLK, PLAINTIFF, PRO SE
3217 WEST APOLLO ROAD
PHOENIX, ARIZONA 85041
480.721.1248

POLK  VS  SKYLINE EDUCATION, INC.                              42

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served on plaintiff at the below listed address and/or all parties in this action by hand delivery at the proceeding or by depositing the same in the United States Mail, First Class, Postage Prepaid, Certified, and Return Receipt requested, or by Process Server, Licensed by the State of Arizona

## SKYLINE EDUCATION, INC.
## 2020 NORTH ARIZONA AVENUE
## SUITE 109
## CHANDLER, ARIZONA 85225

RESPECTFULLY, SUBMITTED ON THIS 18TH DAY OF NOVEMBER 1016.

Hillary Charles Polk, Plaintiff, Pro Se
3217 WEST APOLLO ROAD
PHOENIX, Arizona 85041
480.721.1248